*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* I. A. K. N. WARD, Minor.

UNPUBLISHED
April 30, 2026
2:49 PM

No. 376765
Muskegon Circuit Court
Juvenile Division
LC No. 23-001065-NA

Before: RIORDAN, P.J., and REDFORD and PATEL, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to her minor child, IW, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (additional conditions have not been rectified), (g) (improper care or custody), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. PERTINENT FACTS AND HISTORY

When IW was born, he tested positive for cocaine and THC, and he was diagnosed with an arm paralysis and a sucking and swallowing incoordination that required follow-up appointments, including with a plastic surgeon. Children's Protective Services (CPS) filed a complaint against respondent-mother when IW was born, and when respondent-mother missed IW's follow-up appointments to address his special needs. For approximately two months, CPS tried to contact and locate respondent-mother to no avail.

In March 2023, approximately two months after IW was born, the Department of Health and Human Services (DHHS) petitioned the trial court to remove IW, and his four other half siblings, from respondent-mother's care because of her substance abuse, her significant criminal history, two outstanding warrants, and history of failing to comply or cooperate with CPS. The goal of this petition was to provide respondent-mother with the necessary services to address her housing, employment, mental health, substance abuse, criminality, and parenting skills, so that IW could eventually be reunified with respondent-mother. IW was placed into a licensed foster home that was capable of meeting his needs, and respondent-mother was allowed supervised visits.

From March to July 2023, respondent-mother participated in supervised parenting times, random drug screens, and other required services like substance-abuse therapy and parenting classes. She also had consistent employment and was living with her mother. However, between July and October 2023, respondent-mother lost her job because of poor attendance, tested positive for THC and cocaine several times, stopped attending treatment for her substance abuse and mental health, obtained another active warrant that led to her arrest, and no longer had a clear residence. Further, respondent-mother was referred for a psychological evaluation, but she failed to attend. Respondent-mother also began refusing drug screens and had not attended parenting time for any of her children from June to October 2023. So, in October 2023, the trial court suspended respondent-mother's parenting time for the first time.

Respondent-mother's parenting time was suspended from October 2023 through March 2024. While it was suspended, respondent-mother continued to refuse drug screens, failed to participate in substance-abuse services, and was incarcerated at Muskegon County Jail in December 2023. However, while respondent-mother was incarcerated, she once again began to engage in required services for substance abuse, mental health, and parenting. Because of her willingness to engage in the required services during her incarceration, the trial court reinstated respondent-mother's parenting time in April 2024. From April to July 2024, respondent-mother engaged with the recommended services through the jail. However, in July 2024, respondent-mother was discharged from several required services because she missed too many classes. In addition, respondent-mother engaged in only one parenting time between April and July 2024.

In September 2024, respondent-mother was released from jail. Upon her release, she inconsistently attended parenting time, failed to find employment, refused mental-health services and a substance-abuse assessment, and demonstrated a general unwillingness to engage in her treatment plan. Respondent-mother also continually failed to communicate with DHHS.

From October 2024 to July 2025, respondent-mother refused mental-health services and a substance-abuse assessment. She also did not engage in her treatment plan. She attended two parenting times and then canceled or failed to confirm the rest. Her parenting time was once again suspended in November 2024. From November 2024 through April 2025, DHHS tried numerous times to contact respondent-mother but was unsuccessful. DHHS regularly attempted to reach respondent-mother via phone, text, OTIS search,[1] mail to last known addresses, contact with relatives, and social media searches, to no avail. Then, in April 2025, respondent-mother's mother notified DHHS that respondent-mother was once again incarcerated, this time for auto theft. DHHS attempted to contact respondent-mother while she was incarcerated; however, it received no response.

In January 2025, the trial court ordered DHHS to initiate proceedings to terminate respondent-mother's parental rights because she was no longer participating in the required services. In July 2025, the trial court terminated respondent-mother's parental rights, finding clear and convincing evidence under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). The trial court specifically noted that respondent-mother demonstrated a clear unwillingness to work toward

---

[1] Michigan Department of Corrections, Offender Tracking Information System <https://mdocweb.state.mi.us/otis2/otis2.aspx> (accessed March 25, 2026).

addressing her substance abuse, mental illness, or criminality over the course of this two-year proceeding. Further, the trial court determined that termination was in IW's best interests because IW was bonding well with his prospective adoptive foster family, his needs were being met, and he was showing significant improvement while in foster care. The trial court also emphasized that respondent-mother had only seen IW 21 times in the first two years of his life, and it was clear that IW did not have a bond with respondent-mother because he did not know her.

Respondent-mother now appeals, arguing that the trial court erred by finding that termination of her parental rights was in IW's best interests because it could have imposed a guardianship in lieu of termination of her parental rights.

## II. STANDARD OF REVIEW

"We review for clear error the trial court's determination of best interests." *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021). "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *Id*. (quotation marks and citation omitted). A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake was made. *Id*. We give "due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted). A clearly erroneous decision "must be more than maybe or probably wrong." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011).

## III. BEST-INTEREST DETERMINATION

The trial court did not clearly err by finding that it was in IW's best interests to terminate respondent-mother's parental rights.

In general, even if the trial court determines that there are statutory grounds supporting termination,[2] "it cannot terminate the parent's parental rights unless it also finds by a preponderance of evidence that termination is in the best interests of the children." *In re Sanborn*, 337 Mich App at 276 (quotation marks and citation omitted).

In the present case, respondent-mother makes only two arguments regarding IW's best interests: (1) the trial court failed to consider guardianship as an alternative to terminating her parental rights, and (2) the trial court failed to consider that termination violated her due-process rights. We address each in turn.

---

[2] Respondent-mother does not challenge the statutory grounds for termination. Therefore, we presume that the trial court did not clearly err by finding that the statutory grounds were established by clear and convincing evidence. See *In re Sherman*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000). Regardless, having reviewed the record, we conclude that clear and convincing evidence supports termination under at least one of the statutory grounds. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

First, respondent-mother argues that it was not in IW's best interests to terminate her parental rights because the trial court failed to consider guardianship as an alternative. We disagree.

In some cases, placing the child in guardianship in lieu of termination of parental rights may be appropriate. *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 6. A guardian typically is appointed "in an effort to avoid termination of parental rights." *In re TK*, 306 Mich App 698, 705; 859 NW2d 208 (2014). "A trial court is not required to establish a guardianship in lieu of termination if it is not in the child's best interests to do so." *In re Lombard*, ___ Mich App at ___; slip op at 6. "However, a trial court must refrain from implementing a blanket policy disfavoring guardianships and instead must make an individualized determination regarding a child's best interests." *Id*.

Here, the record demonstrates that the trial court considered guardianship, and DHHS pursued the guardianship alternative for a significant amount of time during these proceedings. Specifically, DHHS investigated IW's first foster family regarding guardianship, but they ultimately declined. DHHS also investigated respondent-mother's grandmother, but the maternal grandmother did not complete the necessary documents for licensing and was not deemed appropriate for guardianship because of her CPS history and because of the criminal history of her adult son who resided with her. In addition, DHHS considered the paternal grandmothers of IW's half-siblings. However, both declined because of lack of space and the fact that they already were caring for IW's half-siblings. Moreover, DHHS considered a cousin of IW's father,[3] but that did not come to fruition. There also was testimony that DHHS looked on a quarterly basis for relatives of IW who would be willing to take guardianship, but those searches did not reveal any placements for IW.

Further, the record indicates that respondent-mother never provided any potential relatives who could take guardianship of IW when DHHS was pursuing guardianship as a possibility for IW. It was not until the termination hearing that respondent-mother's counsel bombarded the testifying caseworker with names of other individuals, asking if those individuals had been investigated as potential guardians. However, respondent-mother's counsel did not explain who these people were, how they were related to IW, or why they could be guardians for IW. Under these circumstances, it is inaccurate to suggest that DHHS did not adequately investigate the possibility of guardianship.

Also, when respondent-mother's counsel argued at the termination hearing that DHHS failed to adequately investigate guardianship as an alternative, the trial court specifically addressed this argument and rejected it. Accordingly, respondent-mother's argument that "there was absolutely no discussion regarding the possibility of guardianship by the trial court" is belied by the record.

Second, respondent-mother argues that the trial court failed to consider her constitutional right to raise her child because guardianship was a less-restrictive alternative. In support of this

---

[3] The parental rights of IW's father were terminated in the same proceeding as respondent-mother's rights. However, the father is not a party to this appeal.

argument, respondent-mother asserts that the trial court was required to "choose the least restrictive means available to provide for the safety and well-being of [her] children." See generally, *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982) ("[S]tate intervention to terminate the relationship between a parent and the child must be accomplished by procedures meeting the requisites of the Due Process Clause.") (cleaned up).

While respondent-mother is correct that she was, and is, entitled to due process, caselaw also provides that once a parent has been determined unfit, i.e., there are statutory grounds to support termination, "the child's interest in a normal family home is superior to any interest the parent has." *In re Moss*, 301 Mich App 76, 88-89; 836 NW2d 182 (2013). Therefore, the trial court had no obligation to place predominant weight on the respondent-mother's constitutional right to parent because, when making the best-interest determination, it is the child's interest that must prevail. See *id*. at 86-89.

Further, as discussed earlier, guardianship was not an available alternative because the DHHS pursued guardianship as a goal for over a year and found no willing or able relatives to take guardianship of IW. And, as the trial court properly recognized, respondent-mother effectively abdicated all responsibility for IW when she allowed IW to be cared for by other people while she made little effort to address the barriers to reunification. Therefore, as a practical matter, respondent-mother had little interest in providing for IW's safety or well-being. Accordingly, this argument is not persuasive.

Beyond these two arguments, respondent-mother makes a generalized challenge to the trial court's best-interest analysis. The trial court may consider several factors in this analysis, including:

> the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's wellbeing while in care, and the possibility of adoption. [*In re Rippy*, 330 Mich App 350, 360-361; 948 NW2d 131 (2019) (quotation marks and citations omitted).]

"A parent's substance-abuse history is also relevant to whether termination is in the child's best interests." *Id*. at 361.

In the present case, the trial court found that it was in IW's best interests to terminate respondent-mother's parental rights because of respondent-mother's substance abuse and criminality; unwillingness to engage in services to address her substance abuse, mental health, and parenting skills; and unwillingness to communicate with DHHS or spend time with IW. The trial court also considered the fact that IW had spent nearly his entire life in the care of his foster family and had improved while in the care of his foster family and the prospective adoptive family that he was placed with shortly before the hearing. The trial court also specifically noted that IW did not know respondent-mother because she had only visited him 21 times in two years.

Given these facts, the trial court did not clearly err by determining that it was in IW's best interests to terminate respondent-mother's parental rights because respondent-mother had no bond with IW, respondent-mother did not substantially comply with her case service plan for the majority of this two-year proceeding, and respondent-mother had a substantial substance-abuse history that she refused to address. Further, IW was doing well in the care of a prospective adoptive family.

## IV. CONCLUSION

The trial court did not clearly err by finding that termination of respondent-mother's parental rights was in IW's best interests, nor did it otherwise err with respect to the possibility of a guardianship during these proceedings. We affirm.

/s/ Michael J. Riordan
/s/ James Robert Redford
/s/ Sima G. Patel